1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    SCOTT BRODIE,                           No. CIV S-09-2338-CMK

12                  Plaintiff,

13          vs.                               <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
      SECURITY,

15                  Defendant.

16    _____/

17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20    Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21    judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22    before the court are plaintiff's motion for summary judgment (Doc. 15) and defendant's cross-

23    motion for summary judgment (Doc. 18).

24    / / /

25    / / /

26    / / /

# I. PROCEDURAL HISTORY

Plaintiff first applied for social security benefits on January 10, 2000, claiming that disability began on November 22, 1998.  Plaintiff claims that disability is caused by a combination of syncope [fainting], seizure disorder, and sleep apnea.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, and an unfavorable decision was issued on October 24, 2001, by Administrative Law Judge ("ALJ") Nicholas Stucky.  The Appeals Council declined review and plaintiff did not appeal.[1]

Plaintiff filed a second application for benefits on January 20, 2002, again claiming disability since November 22, 1998.  This application was also denied initially and on reconsideration.  Plaintiff requested an administrative hearing, which was held on May 21, 2003, before ALJ F. Lamont Liggett.  In a September 17, 2003, decision, plaintiff was once again found to be not disabled.  After the Appeals Council declined review, plaintiff appealed and this court affirmed the agency decision in March 2006, and plaintiff appealed.  The Ninth Circuit Court of Appeals affirmed in an unpublished memorandum disposition issued on February 21, 2008.[2]

While plaintiff's appeal from the September 17, 2003, denial of benefits was pending in the Ninth Circuit, the matter came before the agency again on a third application for benefits filed in September 2004.  Another administrative hearing occurred on September 6, 2006, before ALJ Mark C. Ramsey.  In a January 22, 2007, decision, plaintiff was again found to be not disabled.  The Appeals Council granted review of this decision and, on August 28, 2008,

---

[1]     The doctrine of administrative res judicata precludes any arguments concerning plaintiff's non-disability prior to October 24, 2001.  In addition, the prior determination that plaintiff is not disabled gives rise to a presumption of continuing non-disability.

[2]     Based on the doctrine of res judicata and the presumption of continuing non-disability, the ultimate affirmance of the September 17, 2003, unfavorable agency decision means that plaintiff is considered not disabled through the date of that decision.  Thus, the relevant time period in this case is September 17, 2003, through the date of the current agency decision under review.

issued an order remanding to the ALJ for further proceedings.  The Appeals Council stated that it was vacating and remanding for the following reasons:

1.  The record shows that the claimant is mildly obese (Exhibits 2F/11, 7F).  However, the decision does not contain an adequate evaluation of the claimant's obesity in accordance with Social Security Ruling 02-01p which requires adjudicators to consider the effect of obesity not only under the Listings but also when assessing a claim at other steps of the sequential evaluation process.

2.  The hearing decision finds that the claimant has <u>mild</u> restriction of activities of daily living, <u>mild</u> difficulty in maintaining social functioning, <u>no</u> difficulties in maintaining concentration, persistence, or pace, and <u>no</u> episodes of decompensation (see page 5).  However, this "B" criteria evaluation is inconsistent with the Administrative Law Judge's finding of a severe depression (Finding 2).  The decision does not provide rationale to reconcile the discrepancy about whether the mental impairment is severe or not.

3.  The hearing decision does not contain an adequate evaluation of the examining source opinion in Exhibit 7F.  The neurological consultative examiner, Dr. Pathak, stated "the recurrent passing out and dizziness spells makes it difficult for him to be gainfully employed."  He further stated that the claimant's major disabling factor was passing out episodes once or twice a week and feeling dizzy and having deja vu feeling on a daily basis.  The Administrative Law Judge did not adequately explain the weight given to this opinion.

4.  The decision does not evaluate the lay statements from claimant's significant other, Kristin Sterling, in Exhibit 8E.  Kristin Sterling stated that the claimant often became unconscious and had [a] difficult time focusing after seizures.  She further stated that the claimant must always try to be aware of surroundings to prevent injury.  The Administrative Law Judge did not explain the weight given to these statements in accordance with Social Security Ruling 06-03p.  Social Security Ruling 06-03p states that the adjudicator should explain the weight given to opinions from other sources in the decision to ensure that the decision allows the claimant or a subsequent reviewer to follow the adjudicator's reasoning.

5.  The decision does not provide an adequate consideration of steps four and five of the sequential evaluation process. At step four of the sequential evaluation process, the decision does not contain an analysis of claimant's past relevant work or a comparison of the claimant's residual functional capacity with the physical and/or mental demands of past relevant work as the claimant performed it,

1             or as the job is generally performed in the national economy
(citations omitted). At step five of the sequential evaluation
2             process, the decision used Rule 204.00 as a framework to find the
claimant "not disabled," but did not cite any jobs which the
3             claimant can perform with his assessed limitations.

4 Among the Appeals Council's instructions to the ALJ on remand was the following: "If

5 warranted, obtain evidence from a neurological medical expert to clarify the nature and severity

6 of the claimant's seizure disorder (citations omitted)."

7             Plaintiff appeared for another administrative hearing on February 24, 2009. In an

8 April 22, 2009, decision, the ALJ concluded that plaintiff is not disabled based on the following

9 relevant findings:

10          1.     The claimant meets the insured status requirements through December 31,
                    2003;
11

12          2.     The claimant has the following severe impairments: seizure disorder,
                    vasodepressive [sleep apnea] syndrome, and syncope;

13          3.     The claimant does not have an impairment or combination of impairments
                    that meets or medically equals an impairment listed in the regulations;
14

15          4.     The claimant has the residual functional capacity to perform a full range of
                    work at all exertional levels, but with the following non-exertional
16                     limitations: avoid working at heights and around moving machinery;

17          5.     The claimant has no limitations associated with his mental impairment as
                    that impairment is found to be non-severe; and

18          6.     The claimant is capable of performing his past relevant work as a security
                    guard.
19

20 After the Appeals Council declined further review on August 7, 2009, this appeal followed.

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

November 30, 2004 – Plaintiff submitted a Seizure Questionnaire.  He indicated that his last four seizures had occurred on November 18, 2004, November 22, 2004, November 28, 2004, and earlier in the day on November 30, 2004.  Plaintiff sated that these seizures result in convulsions and loss of consciousness.  He stated the seizures last 1-2 minutes and that, after the seizures, he feels disoriented, nauseous, light headed, and very tired.  Plaintiff added that it takes him two or more hours to recover, though he remains tired for the rest of the day.  Plaintiff stated that medication is not helpful and causes side effects worse than the seizures.

December 8, 2004 – Plaintiff submitted a Function Report – Adult.  Plaintiff stated that he is unable to have a normal life due to seizures, syncope, and sleep apnea.  As to personal care, plaintiff stated that he is unable to do anything on his own following a seizure.  As to cooking, he stated that he cooks microwave meals on his own most days on "good days," that this takes him 2-5 minutes to accomplish, and that he had been advised by his doctors not to cook on the stove.  He stated that he could do light cleaning, but not on days when he has a seizure.  As to getting about, plaintiff stated that he drives a car, but never by himself.  Plaintiff stated that he is able to handle money.  He stated that he cannot walk any distance due to fatigue, and that his attention and ability to follow instructions is "fine until [seizure], syncope."  He added that he does not handle stress or changes in routine well, and that he cannot get along with authority figures.

On this same date, plaintiff's "significant other" Kristin Sterling submitted a Function Report – Adult Third Party.  Ms. Sterling reported that plaintiff must "be constantly aware of surroundings."  She also stated that plaintiff cannot do any house or yard work because it is too dangerous given his seizures.  She stated that plaintiff is often unconscious due to his seizures and has a difficult time focusing after a seizure episode.  Ms. Sterling added that

1    plaintiff's condition causes him depression, social embarrassment, and isolation.

2                        December 14, 2004 – Agency examining psychiatrist Pavitar S. Cheema, M.D.,

3    performed a comprehensive psychiatric evaluation.  Plaintiff reported that his chief complaint

4    was "passing out."  Per plaintiff's report, the doctor recited the following history:

5            The patient gives a history of episodes of loss of consciousness.  The
             patient reports that he passes out, lasting for one minute to 1-1/2 minutes.
6            The patient states that sometimes he gets several episodes of passing out a
             day.  Patient states that he has obtained injuries and feels embarrassed by
7            passing out.  He states that he feels depressed and anxious, because he is
             not able to do what he used to do.  The patient states that his activities are
8            limited.  The patient states that he cannot do the things that he used to do.
             Patient reports that he is worried about his health.  The patient states that
9            he feels sad, as he feels not productive.  The patient states that he has
             feeling of helplessness and gets irritability of mood.
10
             The patient denies a history of feelings of hopelessness and helplessness.
11           No history of feelings of worthlessness.  No history of suicidal thoughts.
             No history of getting special messages from the TV or radio.  No history
12           of elated mood.  No history of racing thoughts.  No history of any kind of
             hallucinations.  No paranoid or delusional thoughts.
13
             No history of alcohol or drug abuse.
14

15   Plaintiff reported that, at the time of the evaluation, he was not taking any medication for anxiety

16   or depression.  As to activities of daily living, plaintiff told Dr. Cheema that he is able to take

17   care of his physical hygiene.  On mental status examination, Dr. Cheema diagnosed mood

18   disorder secondary to medical problems and assigned a global assessment of functioning

19   ("GAF") score of 65 out of a possible 100.  Dr. Cheema offered the following source statement:

20           The patient presents a history of seizures and passing out.  The patient
             states that he has been on several medications, but the medications have
21           not been able to control his seizures.  The patient has depressive
             symptoms.  Based on the history provided by the patient and the current
22           mental status examination, from a psychiatric point of view, patient should
             be able to relate to the public, co-workers, and supervisors.  He should be
23           able to remember, understand, and carry out complex job instructions, as
             well as simple job instructions.  He should be able to deal with changes in
24           routine work settings.  Patient's social interactions are fair.  He takes care
             of routine minor chores for himself.  Prognosis for this patient is fair.  This
25           claimant is able to manage his benefit fund.

26   / / /

1          <u>January 3, 2005</u> – Agency consultative psychiatrist D.R. Walk, M.D., submitted a

2    Psychiatric Review Technique form.  The doctor concluded that plaintiff has a non-severe

3    affective disorder evidenced by depressive syndrome with sleep disturbance, decreased energy,

4    and difficulty concentrating.  Dr. Walk opined that plaintiff was mildly limited in activities of

5    daily living, social functioning, and ability to maintain concentration, persistence, or pace.  No

6    episodes of decompensation were noted.

7          <u>February 15, 2005</u> – Agency examining doctor Steve McIntire, M.D., conducted a

8    neurologic evaluation relative to plaintiff's complaint of seizures and syncope.  Dr. McIntire

9    reported the following history:

> The claimant gives a vague history.  He indicates that his seizures began in
> approximately 1998-1999.  He states that he was not diagnosed however
> until 1-2 years ago.  His description of his seizures is somewhat atypical.
> He states that he has a sense of deja vu.  He then experiences tunnel
> vision.  The claimant also indicates that he has a sense of lightheadedness
> with these spells.  When questioned, he indicates that they do often occur
> when he stands up.  After the tunnel vision, he then has a loss of
> consciousness.  He indicates that he has been told, however, that this does
> not last more than a minute.  It occurs for approximately 30 seconds to a
> minute.  When questioned about post ictal symptoms, he indicates that
> there is confusion but this lasts approximately 5-10 minutes and then
> resolves.  The claimant denies a history of loss of bladder control.  He
> believes that he has bitten his tongue a couple of times.
>
> He then states that he also has syncopal episodes, but that he cannot
> distinguish his syncopal episodes from his seizures.  The claimant
> indicates that he currently has 1-2 spells per week.  Despite this frequency,
> he is not being treated with any antiepileptic medications.  He indicates
> that he has been treated with many medications for his seizures.  He
> mentions "beta blockers and antidepressants" as his seizure medications.
> As indicated, I do not have any of the records to review regarding his
> treatment.  I do not have any brain imaging results to review or EEG
> results to review.  When questioned, the claimant may have undergone
> telemetry at Auburn Faith Hospital.  He indicates that he was there for
> several days and had EEG studies.  It is unclear if some of his seizures
> represent non-epileptic seizures or pseudoseizures.  He also indicates that
> he has undergone tilt table testing, but I do not have this result either.

24   / / /

25   / / /

26   / / /

As to activities of daily living, plaintiff reported that he can do house work on his own.

Following his examination, Dr. McIntire diagnosed: "Question probable syncopal episodes" and

"Question history of seizures." As for a functional assessment, the doctor reported:

> Objectively, there are no significant deficits on neurological exam.

> The claimant has certain very specific environmental limitations. He should not work at heights or over the water or with heavy machinery or in similar capacities where he may place himself or others at risk were he to have a syncopal episode of loss of consciousness. Aside from these specific environmental limitations, the current exam does not suggest other limitations. There are not limitations suggested in terms of time sitting, standing, or walking, or lifting, or carrying. There are no postural, manipulative, communicative, or cognitive limitations suggested by the present exam.

> February 17, 2005 – Plaintiff underwent an internal medicine evaluation

performed by agency examining doctor Rajiv S. Pathak, M.D. Plaintiff reported the following

regarding his symptoms:

> His symptoms have been going on for about five years. In addition, they are still ongoing. Sometimes he passes out. Sometimes it feels close to passing out. Even now, he is passing out once or twice a week. He gets spells when he feels close to passing out but does not pass out every day, up to 10 times a week. During typical spell, he gets tunnel vision. He gets a flashback. He gets a deja vu feeling. Neck feels stiff. His veins pop. His eyes roll to one side. Each spell lasts 30-90 seconds. When he passes out, he wakes up on the ground. Sometimes he slumps over in the chair. Typically, he does not have post ictal state. He is aware of everything and conversant . . . immediately. Only two times during these spells, he had tongue biting. He never had any incontinence. He typically gets an aura. That lasts 20 to 30 seconds. Initially his driver's license was pulled. Currently he got it back on the grounds that if he gets an aura he can pull over if he gets this spell while driving. He is driving currently. Frequently he feels dizzy and lightheaded during these spells also.

After completing an examination and recording objective findings, Dr. Pathak diagnosed

recurrent episodes of syncope and possible seizure disorder, both of unknown etiology. He also

diagnosed mild sleep apnea syndrome. Dr. Pathak offered the following functional capacity

assessment:

> It is difficult in this patient. His examination is completely normal. His major disabling factor is passing out episodes once or twice a week and feeling dizzy and having deja vu feeling on a daily basis. Interestingly he

1   is driving.  He does not have sitting, standing, bending, or weight lifting
    limitations.  Recurrent passing out and dizziness spells makes it difficult
2   for him to be gainfully employed.

3   March 11, 2005 – Agency consultative doctor W.S. Miller, M.D., submitted a

4   Physical Residual Functional Capacity Assessment.  The doctor opined that plaintiff could

5   occasionally lift 20 pounds and frequently lift 10 pounds.  Plaintiff could stand/walk for four

6   hours in an eight-hour day, and sit for six hours.  Dr. Miller concluded that plaintiff's push/pull

7   ability was unlimited.  The doctor also opined that plaintiff could occasionally climb stairs and

8   ramps, but should never climb ladders, scaffolds, or ropes due to possible seizures.  No

9   manipulative, visual, communicative, or environmental limitations were found.

10  May 3, 2006 – Peter T. Skaff, M.D., submitted a "neurological opinion regarding

11  the etiology of recurrent episodes of loss of consciousness. . . ."  Plaintiff reported the following

12  symptoms:

13  He says his energy is "not good."  His weight is down about 5 pounds over
    the last 2 weeks.  He has been getting headaches on a daily basis.  His
14  sleep is poor due to severe obstructive sleep apnea.  He does not use a
    CPAP machine as he does not tolerate the face mask.  He says he has
15  never been tried on nasal pillows.  His auditory acuity seem to be
    declining.  No other trouble with speech, swallowing, or chewing.  No
16  recent changes in his skin, although he has lesions on the ear that are being
    treated.  He gets easily dyspneic on exertion.  No bowel or bladder control
17  problems.  He generally wakes once a night to urinate.  No joint or muscle
    problems.  No history of diabetes.  He says appetite is good and mood is
18  moody and grumpy.

19  As to the records available to Dr. Skaff, the doctor provided the following summary:

20  I reviewed Dr. Ashley's note from April 6, 2000.  This is the earliest note
    that I have from Dr. Ashley.  She describes the patient having recurrent
21  episodes of syncope, particularly with standing fast, including morning
    symptoms of dizziness, faintness, and woozy-like feelings.  He had been
22  tried on Neurontin without benefit.  The clinical impression was syncope
    rather than seizures.  At the time he was also on Florinef.  MRI of the
23  brain was noted to be "completely normal" (I do not have copies of the
    films or the report to review today).  I reviewed a follow up note . . . from
24  February 27, 2004.  At that time the patient was taking Gabitril 8 mg 3
    times daily and was noted to have continued episodes and had previously
25  failed Zonegran as well as the Neurontin, which was initially tried.

26  / / /

I also reviewed Dr. Diane Sobkowicz's notes, including her reports of tilt table testing. The first tilt table test took place on November 24, 1998. The patient was supine for 1 hour on the tilt table and then placed in the 70 degree upright tilt position and was monitored for 25 minutes without significant change in hear rate or blood pressure. He was given Isuprel while supine and then tilted back to 70 degrees. After 15 minutes he reported lightheadedness and diaphoresis as systolic blood pressure dropped to 66, during which time he had a near syncopal event. He was then started on Theo-Dur, which apparently was later changed to Slobid, along with Florinef. Follow up tilt table on April 19, 1999, was negative.

I also reviewed Dr. Sobkowicz's clinic notes in August 2002. She reported that the patient continued to have "ashen episodes." Holter monitoring was apparently negative during these spells. A more complete description of symptoms is in the July 26, 2002 notes. The patient reported several episodes during the day characterized by diaphoresis, a grayish discoloration of the face, which the wife had noted along with change in breathing pattern as well as "twitching-type sensations" in the shoulders and the arm.

I did review a Holter monitor report from July 25, 2002. The patient did report symptoms of lightheadedness and an episode of slight presyncope associated with normal sinus rhythm. The patient did not apparently report any of his typical episodes of loss of consciousness during the testing.

I also reviewed Dr. Werner's otolaryngological report from May 20, 2004. This is a review of the patient's polysomnogram, which apparently showed an apnea-hypopnea index of 44 and a trial of CPAP was recommended.

Finally, I reviewed some labs from November 2005, including a normal comprehensive metabolic profile; elevated total cholesterol of 213, triglyceride 150, LDL 127, and HDL 56; and from November 2003, a TSH of 1.28 and a B12 of 644.

Following a physical examination, the doctor diagnosed recurrent syncope with Stokes-Adams attacks. The doctor did not feel that plaintiff's condition was caused by epileptic seizures. Dr. Skaff recommended 5-7 days of inpatient video EEG monitoring. The doctor did not offer any functional assessment.

        June 3, 2006 – Dr. Sobkowicz's chart notes from this date indicates that plaintiff reported no recent syncope or seizure events.

///

///

10

1      June 5, 2006 – A chart note prepared by Dr. Sobkowicz indicates that plaintiff had

2   recently experienced an episode of about 12 recurrent syncope symptoms.  Plaintiff had been

3   asyncopal since this event.  The doctor started plaintiff on Theodur.

4      July 18, 2006 – Dr. Sobkowicz's notes from this date indicate that plaintiff

5   reported feeling better "with regard to his syncope and near syncopal episodes."  Plaintiff

6   reported only one such episode per week now.  Plaintiff was started back on Theodur.

7      January 2, 2007 – Dr. Sobkowicz's chart notes reflect that plaintiff reported

8   syncopal episodes occurring about twice a week.  The doctor diagnosed questionable

9   vasodepressor seizure disorder.

10      October 1, 2007 – Dr. Sobkowicz's chart notes from this date indicate that the

11   doctor continued to diagnose questionable vasodepressor seizure disorder.

12      March 13, 2008 – A discharge report prepared by Robert S. Burgerman, M.D., at

13   Sutter General Hospital indicates that plaintiff was admitted for nine days of 24-hour video EEG

14   monitoring.  No episodes occurred during this time and plaintiff was discharged.  Dr. Burgerman

15   reported as follows:

16          This is a non-diagnostic 9-day video EEG monitoring session.  In the
            absence of recorded clinical events, definitive statements regarding their
17          nature cannot be made.  While the clinical description of the events
            suggests that the video correlation may be as valuable to the study as the
18          EEG activity, ambulatory EEG studies should be considered since there
            was an absence of spontaneous clinical events in the hospital after
19          prolonged recording.

20      April 18, 2008 – Dr. Sobkowicz's chart notes indicate that plaintiff completed a

21   ten-day inpatient seizure evaluation "which was non-diagnostic."  Plaintiff reported that he was

22   planning on undergoing a three-day ambulatory EEG study.

23      August 15, 2006 – The record contains a chart note prepared by Dr. Sobkowicz.

24   The doctor indicates that plaintiff had "stopped the Theodur since he had diffuse muscle

25   twitching with it."  Plaintiff reported syncopal episodes every 2-8 days.

26   / / /

1          October 15, 2008 – Agency examining doctor Maliheh Massih, M.D., performed a

2    neurologic evaluation.  As to daily activities, plaintiff reported being independent with self care.

3    He also reported that he helps with house work.  He told the doctor that he is able to drive

4    because he has an "aura" prior to a seizure which allows him time to pull over.  Based on a

5    physical examination, Dr. Massih offered the following functional assessment:

6                    The claimant can be expected to stand and walk without limitations during
                    an eight-hour workday.
7
                    The claimant can be expected to sit without limitations during an eight-
8                   hour workday.

9                   No assistive device is used.

10                  Postural [activities] in regards to bending, stooping, and crouching can be
                    done without limitation.
11
                    Manipulative [activities] with reaching, handling, and feeling can be done
12                  without limitations.  With regards to grasping and fingering, given his
                    remote history of carpal tunnel syndrome and occasional numbness and
13                  tingling that he reports, these maneuvers, grasping and fingering, should
                    only be done on an occasional basis and not on a frequent, constant, or
14                  repetitive basis.

15                  With regards to his seizure disorder, workplace environmental restrictions
                    should be taken into consideration.  He should not be in any situation
16                  where he may be operating heavy machinery or working at heights.

17                  November 7, 2008 – Chart notes prepared by Dr. Sobkowicz indicate that plaintiff

18   reported about one syncopal episode per week, with the last one occurring about a week earlier.

19   The doctor reported that plaintiff "had a lightheaded episode while in the office today."  The

20   doctor did not provide any detailed description of this event.  Dr. Sobkowicz continued to

21   diagnose questionable seizure disorder.

22                  February 3, 2009 – Nathaniel Tucker, M.D., submitted a medical source

23   statement.  Dr. Tucker opined that plaintiff's ability to sit, stand, and walk are compromised by

24   syncopal attacks.  The doctor's functional assessment was based on whether plaintiff was having

25   an attack or not.  For example, the doctor opined that plaintiff could sit for less than an hour if

26   having an attack, but if not he could sit for six to eight hours.  Dr. Tucker's assessment was

1    similar for other areas of functioning, such as lift/carry, climbing, etc.  As to plaintiff's functional

2    capabilities, Dr. Tucker stated that plaintiff could perform at least the full range of sedentary

3    work so long as he was not experiencing a syncopal episode.  In sum, the doctor essentially

4    opined that plaintiff cannot work at all because his syncope is unpredictable.

5

6                            **III.  STANDARD OF REVIEW**

7                The court reviews the Commissioner's final decision to determine whether it is:

8    (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

9    whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

10   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

11   (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

12   support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

13   including both the evidence that supports and detracts from the Commissioner's conclusion, must

14   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

15   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

16   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

17   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

18   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

19   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

20   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

21   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

22   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

23   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

24   Cir. 1988).

25   / / /

26   / / /

# IV.  DISCUSSION

In his motion for summary judgment, plaintiff states:

> This [ALJ hearing] decision so obviously took a complex, puzzling medical situation . . . and carved a simplistic route to a preordained result, that it is hard to know at what level to criticize the decision.  At the conclusion, certain arguments are largely reserved.
>
> * * *
>
> . . . This brief would be longer that it should have to be, were [the] lengthy cherry-picking discussed, but it is further pointed out that – though wrapped up in the ostensible garb of derogating Mr. Brodie – it could, with great effort, be unraveled and shown to violate 20 C.F.R. §§ 404.1527, 416,927, and case law and Social Security Rulings relating thereto.

Plaintiff raises the following specific arguments: (1) in determining which of plaintiff's impairments are severe, the ALJ failed to follow "axiomatic law" that this Step 2 determination is controlled by a de minimus standard; (2) the ALJ's determination at Step 3 that no impairment or combination of impairments satisfies the requirements of Listings 11.02 or 11.03 "does not even begin to explain how it considered medical equivalency" and, thus, "is empty and inaccurate"; (3) the ALJ's residual functional capacity assessment is flawed because it fails to account for plaintiff's mental impairment and fails to account for limitations posed by plaintiff's non-severe impairments; and (4) the ALJ failed to comply with the Appeals Council's order to "obtain evidence from a neurological medical expert to clarify the nature and severity of the claimant's seizure disorder."[3]

/ / /

/ / /

/ / /

---

[3]      In the conclusion paragraph of his brief, plaintiff appears to raise the following additional issues (apparently, these are among the "certain arguments" plaintiff has "largely reserved"): (1) the ALJ improperly rejected "the disabling treating specialist assessment"; and (2) the ALJ improperly found his testimony not credible.  Given that plaintiff does not provide any reasoning or analysis to support these conclusory arguments, the court finds that these issues are not properly before the court.

**A.**    <u>**Severity Determination**</u>

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).[4]   In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  <u>See</u> <u>Smolen v. Chater</u>, 80 F.3d 1273, 1289-90 (9th Cir. 1996); <u>see also</u> 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  <u>See</u> Social Security Ruling ("SSR") 85-28; <u>see also</u> <u>Yuckert v. Bowen</u>, 841 F.2d 303, 306 (9th Cir. 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  <u>See</u> 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone is insufficient.  <u>See</u> <u>id.</u>

Plaintiff argues that the ALJ gave an "unacceptable reason" for finding that his obesity was not a severe impairment.  He also argues that the ALJ improperly dismissed carpel tunnel syndrome and mental impairment as severe impairments.  Finally, plaintiff contends that the ALJ erred by characterizing his sleep apnea as "mild."

/ / /

/ / /

/ / /

---

[4]    Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  <u>See</u> 20 C.F.R. §§ 404.1521, 416.921.

1          1.      Obesity

2          In 1999, obesity was removed from the Listing of Impairments.[5]  Obesity may still

3    enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's

4    musculoskeletal, respiratory, or cardiovascular system."  Celaya v. Halter, 332 F.3d 1177, 1181

5    n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to

6    consider obesity in a multiple impairment analysis, but only where it is "clear from the record

7    that [the plaintiff's] obesity . . . could exacerbate her reported illnesses."  Id. at 1182; see also

8    Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that

9    a multiple impairment analysis is not required where "the medical record is silent as to whether

10   and how claimant's obesity might have exacerbated her condition" and "the claimant did not

11   present any testimony or other evidence . . . that her obesity impaired her ability to work").

12   Where a multiple impairment analysis is not required, the ALJ properly considers obesity by

13   acknowledging the plaintiff's weight in making determinations throughout the sequential

14   analysis.  See Burch, 400 F.3d at 684.

15          The court finds that there is simply no factual basis to plaintiff's argument that the

16   ALJ failed to properly consider obesity.  First, the court is not convinced that obesity has been

17   established.  Second, even if it has been established, there is absolutely no medical evidence to

18   suggest that plaintiff's weight in any way impacted his functional capabilities or exacerbated a

19   medically determinable impairment.  Finally, plaintiff has never alleged disability due to

20   limitations resulting from obesity.

21   / / /

22   / / /

23   / / /

24

25          [5]      Under SSR 02-01p, a person with body mass index ("BMI") of 30 or above is
     considered obese.  BMI is the ratio of an individual's weight in kilograms to the square of height
26   in meters (weight divided by square of height).

1         2.       <u>Carpel Tunnel Syndrome</u>

2         As with obesity, there is no evidence that plaintiff has any significant limitation

3 associated with carpel tunnel syndrome, which is noted in passing in the record.  Moreover,

4 plaintiff does not allege disability based on any limitation caused by carpel tunnel syndrome.

5         3.       <u>Mental Impairment</u>

6         The record indicates that no doctor opined that plaintiff had any mental

7 impairment more serious than mood disorder or affective disorder, both secondary to medical

8 problems.  Dr. Cheema assigned a relatively high GAF score of 65 and did not opine that

9 plaintiff has any limitations associated with a mental impairment.  Similarly, Dr. Walk concluded

10 that plaintiff's mental impairment caused no more than minimal limitations.

11         4.       <u>Sleep Apnea</u>

12         As with plaintiff's mental impairment, the record does not indicate that sleep

13 apnea results in more than minimal limitation to plaintiff's functioning.  Specifically, no doctor

14 has opined that sleep apnea produces functional limitation.

15     **B.**     **<u>Listings Determination</u>**

16         The Social Security Regulations "Listing of Impairments" is comprised of

17 impairments to fifteen categories of body systems that are severe enough to preclude a person

18 from performing gainful activity.  <u>Young v. Sullivan</u>, 911 F.2d 180, 183-84 (9th Cir. 1990); 20

19 C.F.R. § 404.1520(d).  Conditions described in the listings are considered so severe that they are

20 presumed disabling.  20 C.F.R. § 404.1520(d).  In meeting or equaling a listing, all the

21 requirements of that listing must be met.  <u>Key v. Heckler</u>, 754 F.2d 1545, 1550 (9th Cir. 1985).

22         As to the Listings, the ALJ stated:

23       The evidence (see below) fails to document major or minor motor seizures
       documented by EEG and by detailed description of a typical seizure
24       pattern including all associated phenomena, occurring more frequently
       than once a month for major motor seizures and once a week for minor
25       motor seizures, in spite of at least three months of prescribed treatment per
       Section 11.02 and 11.03.

26

1   Plaintiff argues that this analysis is improperly circumscribed in that it "does not even begin to

2   explain how it considered medical equivalency."  Defendant argues in response:

3               Here, the ALJ explained that the evidence did not satisfy the
           requirements of listings 11.02 and 11.03 (Tr. 18).  In so doing, the ALJ
4          explained that his discussion of the evidence continued after this section
           (Tr. 18) ("The evidence (see below) fails to document" the required
5          elements).  Thereafter, the ALJ thoroughly summarized the medical
           evidence and Plaintiff's testimony regarding his impairments, including
6          seizure activity (Tr. 18-27).  As the ALJ pointed out (Tr. 18), Plaintiff
           described atypical seizure patterns (Tr. 223, 226), and he did not undergo
7          treatment in that he took no anti-seizure medications (Tr. 175, 223, 210,
           271).  See 20 C.F.R.  pt. 404, subpt. P, App. 1, § § 11.02, 11.03 (claimant
8          must exhibit "typical seizure pattern" despite 3 consecutive months of
           prescribed treatment).  Under Gonzalez [v. Sullivan, 914 F.2d 1197 (9th
9          Cir. 1990)], the ALJ's summary of the medical evidence and testimony
           provided the foundation upon which the ALJ's listing finding was based.
10         Thus, Plaintiff has failed to identify any error.

11          The court finds no error in the ALJ's Listings analysis.  At the outset, the court

12   rejects plaintiff's apparent argument that the ALJ was required to discuss the medical evidence

13   supporting the Listings analysis in the same part of the hearing decision as the actual Listings

14   analysis.  Nothing in the regulations or case law supports such an argument.  As to Listings 11.02

15   and 11.03, which relate to epilepsy, the regulations state that these listings only apply where there

16   is, at a minimum, evidence of a typical seizure pattern.  In this case, the medical evidence is

17   universal in describing plaintiff's seizure/syncope episodes as atypical.  Thus, the ALJ was

18   correct in concluding that Listings 11.02 and 11.03 are not met or medically equaled in this case.

19          **C.     Residual Functional Capacity Assessment**

20          Residual functional capacity is what a person "can still do despite [the

21   individual's] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v.

22   Heckler, 751 F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current

23   "physical and mental capabilities").  Thus, residual functional capacity describes a person's

24   exertional capabilities in light of his or her limitations.  In determining residual functional

25   capacity, the ALJ must assess what the plaintiff can still do in light of both physical and mental

26   limitations.  See 20 C.F.R. §§ 404.1545(a), 416.945(a) (2003); see also Valencia v. Heckler, 751

F.2d 1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental capabilities").  Where there is a colorable claim of mental impairment, the regulations require the ALJ to follow a special procedure.  See 20 C.F.R. §§ 404.1520a(a), 416.920a(a).  The ALJ is required to record pertinent findings and rate the degree of functional loss.  See 20 C.F.R. §§ 404.1520a(b), 416.920a(b).

Plaintiff argues that the ALJ's residual functional capacity assessment is flawed because it does not account for plaintiff's mental impairment or plaintiff's non-severe impairments.  Defendant responds that, while plaintiff is certainly correct that a residual functional capacity finding should take into account both severe limitations and non-severe limitations, the ALJ is not required to include any limitations on functional capacity that are not supported by evidence of record.  The court agrees and finds that such is the case here.

As to plaintiff's alleged mental impairment, the court agrees with the ALJ that there is simply no evidence to support a finding that plaintiff is functionally limited due to a mental impairment.  The record reflects that plaintiff was examined by Dr. Cheema in December 2004.  At that time, plaintiff reported that he felt sad, hopeless, and irritable.  On mental status examination, Dr. Cheema diagnosed mood disorder secondary to medical problems and assigned a relatively high GAF score of 65.  Functionally, Dr. Cheema did not indicate any limitations related to a mental impairment.  Similarly, Dr. Walk concluded in January 2005 that, while plaintiff has an affective disorder, plaintiff was no more than mildly limited as a result of that condition.  Plaintiff has not pointed to any evidence of record which suggests any moderate or severe limitations imposed by a mental impairment.

As to other non-severe impairments, the court finds that plaintiff's argument is impossible to evaluate because he has not identified any such impairments, let alone suggested what functional limitations they cause.

/ / /

/ / /

1        **D.     Compliance with Appeals Council Remand**

2        Plaintiff contends that the ALJ failed to adhere to the Appeals Council's

3   instructions on remand to "[i]f warranted, obtain evidence from a neurological medical expert to

4   clarify the nature and severity of the claimant's seizure disorder."  He also appears to argue that

5   the Appeals Council further directed the ALJ on remand to re-evaluate the opinion provided by

6   Dr. Tucker in February 2009 and that the ALJ failed to do so.

7        As to the latter contention, the court finds no error because the Appeals Council

8   did not instruct the ALJ to re-evaluate Dr. Tucker's opinion on remand and the court agrees with

9   the ALJ's assessment that Dr. Tucker's extreme opinion is not supported by the weight of the

10  medical evidence.  As to the former contention, the court also finds no error.  Specifically, the

11  word "if" in the Appeals Council order indicates that, contrary to plaintiff's apparent assertion,

12  the directive to obtain expert medical opinion evidence was not mandatory but permissive,

13  depending on the circumstances of the case.  Here, the ALJ correctly concluded that it was not

14  necessary to obtain additional expert evidence to clarify the nature and extent of plaintiff's

15  seizure disorder.  As defendant notes, the evidence was sufficient for the ALJ to analyze the

16  nature and extent of plaintiff's seizure disorder.

17       Regarding the nature of plaintiff's seizure disorder, the record is clear that it's

18  nature (i.e., etiology) cannot be determined.  Regarding the extent of that disorder (i.e., impact on

19  functioning), the evidence indicates that, while various doctors diagnosed syncope and/or

20  questionable seizure disorder, none of the doctors properly credited by the ALJ opined that these

21  conditions significantly limited plaintiff's functioning.  Those limitations as to which the doctors

22  opined – avoiding working at heights or with heavy machinery – were accepted by the ALJ and

23  included in his residual functional capacity assessment.  In other words, even though the doctors

24  accepted plaintiff's subjective reports of multiple episodes per week, each lasting between 30 and

25  90 seconds, the doctors also agreed that this condition does not present significant functional

26  limitation.  In this regard, the doctors as well as the ALJ found it noteworthy that plaintiff still

20

1  drives a car despite his complaints of unpredictable seizure and syncope episodes.

2          Because the evidence was sufficient for the ALJ to conclude that the nature of the

3  seizure/syncope disorder is of unknown etiology and that the extent of that disorder is not such

4  that it results in significant functional limitation, obtaining additional neurological medical

5  expert evidence was not warranted.

6

7                                    **V.  CONCLUSION**

8          At first blush this case seems troublesome because, on the one hand, the ALJ

9  agrees with plaintiff that he has a severe seizure/syncope disorder but, on the other hand, found

10 that this condition does not significantly limit plaintiff's functioning.  This would seem

11 contradictory in that the natural question arises: How can a person who is susceptible to passing

12 out at any time several times a week not be significantly limited in functioning?  As stated at the

13 outset, however, even where the evidence is susceptible to more than one interpretation, the court

14 must accept the ALJ's interpretation so long as it is based on substantial evidence and proper

15 legal analysis.  Under this deferential standard of review, the court must affirm.

16         Based on the foregoing, the court concludes that the Commissioner's final

17 decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

18 ORDERED that:

19         1.    Plaintiff's motion for summary judgment (Doc. 15) is denied;

20         2.    Defendant's cross-motion for summary judgment (Doc. 18) is granted; and

21         3.    The Clerk of the Court is directed to enter judgment and close this file.

22

23 DATED:  March 30, 2011

24                                    _____
                                      **CRAIG M. KELLISON**
25                                    UNITED STATES MAGISTRATE JUDGE

26